# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 14, 2013

## JAMELLE M. FELTS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Robertson County**
**No. 06-0426A     Michael R. Jones, Judge**

---

**No. M2013-00722-CCA-R3-PC - Filed December 17, 2013**

---

The Petitioner, Jamelle M. Felts, appeals the denial of post-conviction relief, arguing that he received ineffective assistance of counsel. He also appeals the denial of coram nobis relief, arguing that an eyewitness's affidavit recanting his trial testimony is newly discovered evidence entitling him to a new trial. Upon review, we affirm the denial of post-conviction relief and the denial of coram nobis relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Joe R. Johnson, for the Petitioner-Appellant, Jamelle M. Felts.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Senior Counsel; John W. Carney, Jr., District Attorney General; and Jason C. White, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Trial.** On direct appeal, this court summarized the proof presented at the Petitioner's trial:

> The convictions in this case are the result of events that took place on June 14, 2006, at the Southfield Apartments in Springfield, Tennessee. Jessica Elmore, a resident of the apartment complex, testified that she was at her home when Nathan Holden arrived and told her to summon the victim, her ex-boyfriend Bryan England, to the apartment. Ms. Elmore went to her sister's apartment, where the victim was playing cards with Michael "Chubby" Babb,

and told the victim that Mr. Holden wanted to see him. The two then walked to Ms. Elmore's apartment together. Because the door was locked, Ms. Elmore knocked and requested entry. As they waited to go inside, two men, whom she identified as the [Petitioner] and Antonio "Doonie" Bigbee, "came . . . [f]rom the parking lot area" armed with an "SK" assault rifle and took the victim "around the corner." At that point, Ms. Elmore "took off back to [her] sister's house" and alerted Mr. Babb, who ran into the parking lot. She then ran back to her own apartment, briefly seeing the victim in the passenger seat of his car. Once inside, she heard tires squealing and a single gunshot.

Ms. Elmore initially lied to police regarding the events of June 14 and refused to disclose the names of the perpetrators. Eventually, however, she agreed to cooperate with police and helped Detective Rickie Morris locate the [Petitioner]'s "MySpace" internet page, which contained a picture of the [Petitioner] holding an SKS assault rifle. Ms. Elmore stated that the rifle appeared to be the same one used during the offenses.

The victim testified that he was playing cards with Mr. Babb and two women when Ms. Elmore summoned him to meet with Mr. Holden at her apartment. The victim explained that the summons concerned him because "I mean [Mr. Holden and I] didn't talk." He recalled that when they reached Ms. Elmore's door, "two guys came from each corner of the breeze way, from each side and then they had me at gunpoint." The men, one of whom was armed with an SKS assault rifle, forced the victim to his car and ordered him to get inside and slide to the middle of the front seat. As the victim complied with the request, Mr. Babb came outside and said, "I know who ya'll are." While the perpetrators were distracted by Mr. Babb, the victim drove away. A single gunshot fired at the victim's car went through the rear window, grazed his shoulder, and exited through the windshield. The victim stated that he drove straight home and telephoned Mr. Babb. The police arrived shortly thereafter, and a friend drove the victim to the hospital. He was released later that same evening.

Michael "Chubby" Babb recalled that on the day of the offenses he was playing cards with the victim and two women when Ms. Elmore arrived and told the victim that "some dude" wanted to speak with him. Mr. Babb stated that he warned the victim not to go, but the victim went anyway. Shortly thereafter, a girl told him that two men were holding the victim at gunpoint in the parking lot. Mr. Babb went to the parking lot and saw the victim sitting in the middle of the front seat of his car with the engine running. Mr. Babb

recognized the [Petitioner], whom he knew as "Scooter," as the gunman and Antonio "Doonie" Bigbee as his accomplice. Mr. Babb yelled, "I know who ya'll is," and when the men turned around, the victim drove away. The [Petitioner] then fired a single shot at the car.

Detective Rickie Morris of the Springfield Police Department investigated the offenses, which were originally reported as "shots fired" at the Southfield Apartments. He found a single spent shell casing from "an assault type weapon" in the parking lot. He stated that the shell casing found in the parking lot was of the type fired by the weapon featured on the [Petitioner]'s MySpace page. He was unable to locate the weapon.

The [Petitioner] presented no proof.

State v. Jamelle M. Felts, No. M2007-00945-CCA-R3-CD, 2008 WL 2521663, at \*1-2 (Tenn. Crim. App. June 24, 2008), perm. app. denied (Tenn. Dec. 22, 2008).

On February 7, 2007, the Petitioner was convicted of one count of reckless endangerment, a Class A misdemeanor, and one count of especially aggravated kidnapping, a Class A felony. The trial court imposed an effective sentence of fifteen years.

**Post-Conviction/Error Coram Nobis Hearing.** On December 18, 2009, the Petitioner filed a timely pro se petition for post-conviction relief, alleging, in part, ineffective assistance of counsel. Following the appointment of counsel, Petitioner filed a petition for writ of error coram nobis on September 1, 2010, and an amended petition for post-conviction relief on December 16, 2011. In the petition for writ of error coram nobis, the Petitioner alleged that he had newly discovered evidence in the form of an affidavit signed by Michael Babb stating that Babb's identification of the Petitioner at trial as the gunman was untrue. The Petitioner further alleged that Babb's affidavit entitled him to coram nobis relief because it may have changed the outcome of his trial if it had been presented to the jury. In the amended post-conviction petition, the Petitioner alleged that there was a fatal variance between the factual allegations in count 3, the count charging him with especially aggravated kidnapping, and the proof at trial.

At the post-conviction hearing, the Petitioner, age twenty-four, testified that the State failed to provide him with adequate notice of the evidence that would be presented against him in count 3. He said that although count 3 only stated that he had "confined" the victim during the offense, the State presented evidence at trial that the Petitioner had both "removed" and "confined" the victim. However, the Petitioner acknowledged that count 3 did mention him moving the victim, walking the victim to his car, and putting him inside.

The Petitioner was unsure whether trial counsel tried to speak with the attorney representing his co-defendant, Nathan Holden, about having Holden testify on the Petitioner's behalf. He acknowledged that he was the first of the three co-defendants to go to trial. He also acknowledged that Holden still had charges pending and had not settled his case at the time of his trial.

Nathan Holden, one of the Petitioner's co-defendants, was called to testify. In response to the court's questioning, Holden stated that he had testified in the trial of Antonio Bigbee, one of the other co-defendants charged in this case. The court informed Holden that if he testified differently than he had at Bigbee's trial, he could be convicted of perjury or aggravated perjury. After talking to counsel unassociated with the case, Holden exercised his Fifth amendment right not to incriminate himself. Then Petitioner's attorney asked that Holden's affidavit be admitted, and the State objected. Holden's affidavit, which stated that the Petitioner was innocent of the charges and that Petitioner's attorney never attempted to interview him about the Petitioner's involvement in the offense, was entered into evidence.

Trial counsel testified that she had spoken with Holden's attorney about the possibility of Holden testifying in the Petitioner's case but that "there was no way" Holden was going to testify on the Petitioner's behalf. She said it was Holden's attorney's position that "if anybody was going to get a deal it was [Holden]." She did not recall the Petitioner being insistent about wanting to get Holden to testify on his behalf. In fact, she believed that the Petitioner knew Holden "couldn't offer him anything" in his case.

Trial counsel stated that she spent time reviewing the Petitioner's indictment to consider whether the Petitioner was properly charged. She said her file contained "copious case law notes" regarding the Petitioner's charges. In addition, she was able to have the Petitioner's attempted first degree murder charge dismissed because the State had not met its burden regarding that charge. She also stated that she "was very disappointed that the law was written" in such a way that a "[k]idnapping [could] be a kidnapping of two minutes, it could be 30 seconds." She said she was unable to comment as to whether she believed that the State properly charged the Petitioner in count 3. Trial counsel stated that her defense strategy in this case was to challenge Jessica Elmore's and Michael Babb's identification of the Petitioner. She recalled arguing that "it was dark out, they were wearing masks, just because somebody has braids doesn't mean it's the same person as my client . . . ." She also recalled telling the Petitioner that under the theory of criminal responsibility, he could be found guilty of the charged offenses regardless of whether he was holding the gun. Trial counsel stated that Babb "couldn't get his facts straight" and had made "a horrible witness" at trial.

Michael Babb testified that he testified truthfully at the Petitioner's jury trial in February 2007. When asked if he signed an affidavit after the Petitioner's trial that called into question some of his trial testimony, he replied, "I'm not for sure." When he was shown a copy of his affidavit, he acknowledged that he had signed the affidavit but had not read the contents of the affidavit before signing it. Babb said he did not recall a notary putting his stamp on the affidavit after he signed it. He then stated that he was "not sure" if someone had read the contents of the affidavit to him before he signed it. Babb said his appointed attorney had read the affidavit to him the day of the post-conviction hearing and acknowledged that the affidavit stated that he had poor eyesight and could not see the victim's assailants. He also recalled the affidavit stating that Detective Morris coerced him into identifying the Petitioner at trial. Babb stated that although Detective Morris did, in fact, coerce him into signing a statement prior to trial, he did not feel pressure to testify consistently with this statement.

Babb reiterated that he was completely truthful at the Petitioner's trial, that Detective Morris did not coerce him to identify the Petitioner at trial, and that his testimony at trial was given of his own free will. He said he understood that the affidavit was significantly different than what he testified to at trial and that his testimony at trial was the truth. Babb said that no one forced him to sign the affidavit and that he could not recall who asked him to sign it. He acknowledged that the Petitioner could not have personally given him the affidavit to sign because they were not housed in the same prison.

On March 15, 2013, the post-conviction court entered an order denying post-conviction relief and coram nobis relief. Although the court did not address, within the context of ineffective assistance of counsel, the issue of a variance between the allegations in count 3 and the proof at trial, it found that the State's "theories and evidence were fairly embraced in the allegations made in the indictment." Regarding whether counsel was ineffective in failing to interview Holden, the court found that Holden's testimony would not have been beneficial to the Petitioner. Finally, regarding whether Babb's affidavit constituted newly discovered evidence entitling the Petitioner to coram nobis relief, the court determined that the affidavit was not newly discovered evidence because Babb had testified at the post-conviction hearing that "the testimony he gave in the [Petitioner's] trial was true." The Petitioner timely appealed.

## ANALYSIS

**I. Ineffective Assistance of Counsel.** The Petitioner argues that trial counsel provided ineffective assistance by failing to object to a fatal variance between the allegations in count 3 of the indictment and the proof at trial and by failing to interview co-defendant

Nathan Holden to develop him as a potential witness. The State asserts that the Petitioner has failed to prove his claims by clear and convincing evidence. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

First, the Petitioner argues that although count 3 of the indictment did not reference the "removal" of the victim, the proof at trial indicated that the Petitioner "removed" the victim and only "attempted" to "confine" the victim. He asserts that "[d]efense counsel should have objected to the sufficiency of the [i]ndictment once it became clear that the State was arguing both theories of 'removal' and 'confinement,' as defense counsel was not put on adequate notice as to the State's theory in the case."

In support of his claim that the State's evidence showed that he "removed" the victim, he notes Elmore's testimony, wherein she stated that the assailants "took [the victim] around the corner, they were telling him to follow them." She also said, "I seen [the Petitioner] push [the victim] once like just trying to get him to go towards the direction of the car, but he was behind [the victim] just pretty much guiding [the victim] to the car." Moreover, he notes that the State argued in its closing that the Petitioner and the other assailant "removed [the victim] from the breezeway to the car, and they were going to confine him to the car, consistent with getting in the middle so [one of the assailants could] get in and drive." The State then made the following statement during its closing:

> [T]hey removed [the victim] from that breezeway to the car. And then, attempted to confine him, said get in the middle. Not get[] in the driver's side, get in the middle. They attempted to confine him, but it doesn't have to be both. Remember that. It just has to be one, a removal or a confinement. It was a clear removal from the breezeway to the car, in an attempt to confine him once they get in there.

Although the indictment was not included in the record on appeal, the indictment was read to the jury at the beginning of trial and is included in the trial transcript that was made a part of the appellate record. The pertinent portion of the indictment provides:

> . . . . [The Petitioner] unlawfully, feloniously, intentionally, knowingly and by use of a deadly weapon, did confine the victim unlawfully so as to interfere substantially with the victim's liberty. When doing this confinement, the victim suffered bodily injury, to-wit, by having Mr. James [Nathan] Holden specifically ask to see Mr. Brian England, causing Mr. England to walk towards Mr. Holden's supposed location and [the Petitioner] and Mr. Antonio Big[]bee approached Mr. England wearing masks and displaying an assault rifle, demanding that Mr. England get into his car, at which time the Defendants knowingly confined Mr. England to his car, so as to interfere with

-7-

his liberty. Then as Mr. England attempted to drive the car away from the location, during this process, one of the Defendants fired the rifle at Mr. England, causing Mr. England to suffer bodily injury and in violation of T.C.A. [§§] 39-12-101 and 39-13-305 and against the peace and dignity of the State of Tennessee.

As relevant in this case, especially aggravated kidnapping is defined as false imprisonment "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" T.C.A. § 35-13-305(a)(1). The crime of false imprisonment is committed by one "who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 35-13-302(a).

A variance exists when the proof at trial does not correspond to the allegations in the indictment. State v. Keel, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). We note that a variance is not fatal unless it is material and prejudicial. State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984); State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000); State v. Holloman, 835 S.W.2d 42, 45 (Tenn. Crim. App. 1992). "A material variance occurs only if the prosecutor has attempted to rely at the trial upon theories and evidence that were not fairly embraced in the allegations made in the indictment." State v. Mayes, 854 S.W.2d 638, 640 (Tenn. 1993) (citation omitted); State v. Ealey, 959 S.W.2d 605, 609 (Tenn. Crim. App. 1997). Moreover, "[a] material variance will not be found where the allegations and proof substantially correspond." Holloman, 835 S.W.2d at 45.

The Tennessee Supreme Court outlined the following test for evaluating a variance between the allegations in the indictment and the proof presented at trial:

> "Unless substantial rights of the defendant are affected by a variance, he has suffered no harm, and a variance does not prejudice the defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense; all other variances must be considered to be harmless error."

Mayes, 854 S.W.2d at 640 (quoting Moss, 662 S.W.2d at 592).

Upon review, we conclude that the indictment and the evidence substantially corresponded. Count 3, which included a detailed description of the factual allegations supporting the offense and referenced the especially aggravated kidnapping statute,

sufficiently informed the Petitioner of the charge against him and protected him against double jeopardy. Moreover, the trial transcript shows that the State did not attempt to rely upon "theories and evidence that were not fairly embraced in the allegations made in the indictment." Id. Accordingly, we conclude that trial counsel was not ineffective for failing to object to the variance at trial. See Roger Lee Wilson v. State, No. E2003-01378-CCA-R3-PC, 2004 WL 1533830, at *8 (Tenn. Crim. App. 2004) (concluding that trial counsel was not ineffective in failing to raise a variance issue when the Petitioner received sufficient notice of the charges against him, which allowed him to adequately prepare for trial).

Second, the Petitioner claims that trial counsel provided ineffective assistance of counsel by failing to interview Nathan Holden, his co-defendant, to develop him as a potential witness. He notes that Holden's statement, which was admitted at the post-conviction hearing, stated that the Petitioner was innocent of the charges. In addition, he asserts that although trial counsel stated that she discussed the Petitioner's case with Holden's attorney, she never specifically asked Holden's attorney whether Holden would testify on the Petitioner's behalf. The State responds that the Petitioner has waived this issue by failing to provide any legal authority or substantive argument in support of this issue. See Tenn. Ct. Crim. App. R. 10(b). In any event, the State contends that the evidence at the post-conviction hearing established that Holden's case had not been settled at the time of the Petitioner's trial and that Holden's testimony would not have been beneficial to the Petitioner's case. We agree with the State that the Petitioner has waived review of this issue.

The Petitioner's brief provides no substantive argument, no citations to authority, and no references to the record regarding this claim. Accordingly, we conclude that the Petitioner has waived review of this issue. See id. ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Waiver notwithstanding, we conclude that the record fully supports the post-conviction court's finding that Holden's testimony would not have been helpful to the Petitioner's case.

**II. Coram Nobis Relief.** The Petitioner argues that Michael Babb's affidavit, which recanted Babb's trial testimony identifying him as the gunman and was not discovered until after his trial, is newly discovered evidence entitling him to coram nobis relief. The Petitioner asserts that he was without fault in presenting this evidence at trial and that had this affidavit had been presented to the jury, it may have changed the outcome of his trial because it discredited Babb, one of the State's main identification witnesses. The State responds that the Petitioner has failed to establish that Babb's affidavit warrants coram nobis relief. We agree.

A writ of error coram nobis is available to convicted defendants. T.C.A. § 40-26-105(a). However, a writ of error coram nobis is an "extraordinary procedural remedy" that "fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (citing Penn v. State, 670 S.W.2d 426, 428 (Ark. 1984)); State v. Workman, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). "The purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting State ex rel. Carlson v. State, 407 S.W.2d 16, 167 (Tenn. 1966)). "The decision to grant or deny a petition for the writ of error coram nobis on the ground of subsequently or newly discovered evidence rests within the sound discretion of the trial court." Hart, 911 S.W.2d at 375 (citations omitted).

Relief by petition for writ of error coram nobis is provided for in Tennessee Code Annotated section 40-26-105. The statute provides, in pertinent part:

> (b) The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

> (c) The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause. . . .

T.C.A. § 40-26-105(b), (c).

The Petitioner's petition for writ of error coram nobis is based solely on his claim that Babb recanted his testimony in the affidavit he signed after the Petitioner's trial. In certain circumstances, recanted testimony can constitute newly discovered evidence entitling a Petitioner to coram nobis relief. Mixon, 983 S.W.2d at 672 n.16. This court has held that a trial court should grant coram nobis relief on the basis of newly discovered recanted testimony if:

(1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

State v. Ratliff, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001) (citing Mixon, 983 S.W.2d at 673 n.17).

The statute of limitations for a petition for writ of error coram nobis is one year from the date the judgment becomes final in the trial court. T.C.A. § 27-7-103; Mixon, 983 S.W.2d at 671. For the purposes of a coram nobis petition, a judgment becomes final thirty days after the entry of the trial court's judgment if no post-trial motions are filed or upon entry of an order disposing of a timely post-trial motion. Mixon, 983 S.W.2d at 670 (citing Tenn. R. App. P. 4(c); State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996)). Due process considerations may toll the one-year statute of limitations when a petitioner seeks a writ of error coram nobis. Harris v. State, 301 S.W.3d 141, 145 (Tenn. 2010). "[B]efore a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992).

The State has the burden of raising the statute of limitations bar as an affirmative defense in a coram nobis proceeding. Harris, 301 S.W.3d at 144 (citing Harris v. State, 102 S.W.3d 587, 593 (Tenn. 2003)). Whether a claim is barred by the statute of limitations is a question of law, which this court reviews de novo. Id. (citing Brown v. Erachem Comilog, Inc., 231 S.W.3d 918, 921 (Tenn. 2007)). Because the State did not raise the bar of the statute of limitations as an affirmative defense, we will proceed as if the statute of limitations does not preclude our consideration of this case.

At trial, Babb identified the Petitioner as the gunman in this case. However, Babb's affidavit, which was signed more than three years after the Petitioner's trial, states that Babb was unable to identify the Petitioner as one of the victim's assailants and that he identified the Petitioner only after he was threatened and coerced by Detective Morris. Although Babb's testimony at the post-conviction hearing was extremely confusing regarding the affidavit, Babb unequivocally stated that he had testified truthfully at the Petitioner's trial.

-11-

The Petitioner claims that Babb's affidavit is newly discovered evidence and that had this affidavit had been presented to the jury, the outcome of his trial may have been different. We disagree. Babb unequivocally stated at the post-conviction hearing that his trial testimony identifying the Petitioner as the gunman in the victim's case was truthful. In addition, Babb testified that he did not read the contents of the affidavit before signing it. Moreover, Elmore also identified the Petitioner as one of the victim's assailants. Accordingly, we conclude that the affidavit is not newly discovered evidence warranting coram nobis relief and that the trial court did not abuse its discretion in dismissing the petition for writ of error coram nobis. The Petitioner is not entitled to relief.

## CONCLUSION

We affirm the denial of post-conviction relief and the denial of coram nobis relief.

_____
CAMILLE R. McMULLEN, JUDGE

-12-